943 So.2d 256 (2006)
Juan BOGARDUS, Appellant,
v.
JUSTICE ADMINISTRATIVE COMMISSION and Florida Unemployment Appeals Commission, Appellee.
No. 3D06-1127.
District Court of Appeal of Florida, Third District.
November 15, 2006.
Rehearing Denied December 20, 2006.
*257 Juan Bogardus, in proper person.
John Maher, Tallahassee, for appellee, Florida Unemployment Appeals Commission.
Before WELLS, CORTIÑAS, and LAGOA, JJ.
WELLS, Judge.
Juan Bogardus appeals from a final order of the Unemployment Appeals Commission affirming a decision of an appeals referee disqualifying Bogardus from receiving unemployment compensation benefits. We affirm.
Bogardus became an OPS[1] employee of the Broward County Guardian ad Litem Program in March 2004. In late October 2005, the GAL's offices sustained heavy damage from Hurricane Wilma. As a consequence, for several weeks, according to Bogardus, he was working reduced hours and receiving some unemployment compensation.
When the employees finally returned to work, they were asked on a voluntary basis to assist in moving into temporary office space. Bogardus, who had an existing medical condition, volunteered to assist in these tasks but after a few days began to notice a decline in his health.
On November 14, 2005, Bogardus approached his supervisor, Patty Walker, and told her that because of his medical condition and the stress of the drive from his home in Miami-Dade to work in Broward County, he was quitting his job:
REFEREE: Okay. And was the claimant discharged, or did he quit?
WALKER: He quit.
REFEREE: Okay. Did he give notice to you that he was leaving?
WALKER: He  on November  I believe it was on November 14th, he approached me, and we were in temporary quarters in another building after  you know, our building was damaged by the hurricane. He approached me and  and Annette Hutchings, our HR liaison was with me as well, to let me know that he had, you know, spoken to his family and, due to his medical condition that seemed to be worsening and the drive was putting extra stress on that situation, that he felt it was best to leave his position to take care of his medical issues. You know, to be able to address those.
Bogardus admitted that he did not provide a doctor's note stating that he should or could not perform his work nor did he ask for some other work that would not affect his health:
REFEREE: Okay. Did a doctor tell you you could not work?
BOGARDUS: . . . Not exactly, but I was advised that my  my health should be one of the most important things before I considered employment on fields that might [affect] my health.
* * * *
THE REFEREE: And there was no other place that they can put you . . . anywhere else?
* * * *

*258 BOGARDUS: well  well, it could've been a possibility. It could've been a possibility. . . . But I'm sure it could've been possible to place me somewhere that would be not a hazardous condition.
REFEREE: Did you ask?
BOGARDUS: I don't recall asking officially. . . .
As his supervisor testified, she thought highly of Bogardus and would have found some appropriate work for him to do had he asked rather than quit:
WALKER: You know, Ithis has nothing to doI want to make sure [Bogardus] understands, this is not any kind of situation where he should feel that you know it's punitive or anything like that, that he was a good employee, but he absolutely made it clear to me that he could noknow, no longer work for us at that time. And he approached me. I would've definitely found things for him to do, even if it was somea little bit out of the parameters from what he was doing. We would've sat down, discussed new responsibilities, anything that he could've helped with, you know, in the office. But actually renovating the building would definitely not have been his responsibility. That's not my responsibility either. That's the building owner's responsibility. So he would have been given work, yes.
Based on this evidence, the hearing officer found that Bogardus "voluntarily quit on November 14, 2005, when claimant informed the director that he was leaving the job due to his health and due to the long drive." The hearing officer also correctly concluded that under such circumstances "the burden [was] on the claimant to show . . . that he had good cause to quit." As explained in Ritenour v. Unemployment Appeals Comm'n, 570 So.2d 1106, 1107 (Fla. 5th DCA 1990) (citations omitted):
An appeals referee is the trier of fact, and he or she is privileged to weigh and reject conflicting evidence. . . . The question of whether a claimant left work voluntarily is a question of fact. . . . But the question is whether she voluntarily left for good cause. "Good cause" for voluntarily quitting are those circumstances which would impel the average, able bodied, qualified worker to give up his employment.
Here, the hearing officer concluded that Bogardus failed to meet the burden of demonstrating good cause because he "never presented any doctor notes to inform the employer that he could no longer work due to his health conditions," and because he "was aware of the drive from his house to the job site."
Because the referee's conclusion that Bogardus voluntarily quit his job without good cause attributable to his employer was supported by competent substantial evidence, we affirm. See § 443.101(1)(a), Fla. Stat. (2005) (disqualifying an individual from receipt of benefits for that period "in which he or she has voluntarily left his or her work without good cause attributable to his or her employing unit"); Fink v. Florida Unemployment Appeals Comm'n, 665 So.2d 373, 374 (Fla. 4th DCA 1996)("an administrative agency's action should be sustained on appeal if based upon any acceptable view of the evidence"); David Clark & Assocs., Inc. v. Kennedy, 390 So.2d 149, 151 (Fla. 1st DCA 1980) (as trier of fact, the hearing officer is privileged to weigh and reject conflicting evidence).
Affirmed.
NOTES
[1] As defined in section 216.011(dd), Florida Statutes (2006), provides in part:

"Other personal services" means the appropriation category used to fund the compensation for services rendered by a person who is not filling an established position. This definition includes, but is not limited to, services of temporary employees, student or graduate assistants, persons on fellowships, part-time academic employees, board members, and consultants and other services specifically budgeted by each agency, or by the judicial branch, in this category.